In the United States District Court
For the Northern District of Illinois,
Eastern Division

| | |
|---|---|
| BESTAR ELECTRONICS INDUSTRY CO., LTD., | |
| Plaintiff/Counter-Defendant, | |
| v. | 07 C 7290 |
| DIGISOUND-WIE, INC., | Judge Lindberg |
| Defendant/ Counter-Plaintiff. | |

# Defendant's Response to Motion To Dismiss Counterclaim

## 1. Counts III-V of Counterclaim Are Unrelated To Joint Venture Contract

BeStar Electronics Industry Co., Ltd's ("BeStar Electronics") Motion to Dismiss wrongly asserts, without offering any rationale, that all of the counterclaims "arise from purported obligations...BeStar Electronics owes pursuant to the Joint Venture Contract." Three (Counts III-V) of five counterclaims are independent of any have obligations under the Joint Venture Contract: They are based solely on obligations imposed by tort law *i.e.*, Count III for tortious interference with Digisound-WIE's contracts with Dirk de Young and CC Electro Sales, Count IV for tortious interference with Digisound-WIE's customer and prospective customer relationships and business expectancy, and Count V for civil conspiracy. Only Counts I and II are based on obligations arising under the Joint Venture Contract, *i.e.,* Count I for breach of fiduciary duty and Count II for breach of contract. BeStar Electronics therefore has provided no basis for dismissing Counts III-V.

## 2. Digisound-WIE Is at Least a Third-Party Beneficiary under Joint Venture Contract

Digisound-WIE need not be a signatory to the Joint Venture Contract between its parent, Digisound-Electronic GmbH, and BeStar Electronics to sue under it. It need only allege facts that create the inference that the signatories intended it be a third-party beneficiary. *St. John's United Church of Christ v. City of Chicago,* 502 F.3d 616, 625 (7th Cir. 2007) (quoting *Erickson v. Pardus*, 127 S. Ct. 2197, 2200, 167 L. Ed. 2d 1081 (2007)) (dismissal proper "only if the complaint fails to set forth 'enough facts to state a claim to relief that is plausible on its face.'").

The Counterclaim alleges facts leading to the inference that BeStar Electronics intended to benefit Digisound-WIE through its performance of the Joint Venture Contract. *American United Logistics, Inc. v. Catellus Dev. Corp.*, 319 F.3d 921, 930 (7th Cir. 2003) ("A direct third-party beneficiary is a person who, although not a party to the contract, the contracting parties intended to benefit from the contract," as determined by the contract's language and the surrounding circumstances at the time of the contract's execution); *see* Restatement (Second) of Contracts § 302 (1981) (third party is intended beneficiary to an agreement if "recognition of a right to performance in the beneficiary is appropriate to effectuate the intention of the parties and ... the circumstances indicate that the promisee intends to give the beneficiary the benefit of the promised performance."). As a third-party beneficiary, Digisound-WIE has standing to sue under the Joint Venture Contract. *Tradewinds Aviation, Inc. v. Jet Support Serv., Inc.,* 04 C 1406, 2004 WL 2533728, *2 (N.D. Ill. Sept. 27, 2004)

In ¶¶ 1 and 3, the Amended Complaint alleges that the joint venture's purpose was and is for BeStar Acoustic (the joint venture entity) to manufacture parts for Digisound-Electronic GmbH and its affiliates to sell outside of China and that Digisound-WIE was formed specifically to sell the joint venture's products in the U.S. Paragraph 14 alleges facts showing that BeStar

Electronics acknowledged Digisound-WIE's right to its performance under the Joint Venture Contract by providing a September 2007 letter for its customers stating that BeStar Acoustic supplies its "current products for [name of customer] only via Digisound and Digisound affiliated companies in USA." Those allegations must be accepted as true for purposes of the motion. *Saudi Basic Inds. Corp. v. Exxonmobil Corp.*, 194 F. Supp. 2d 378, 394 (D.N.J. 2002); 2 MOORE'S FED. PRAC. §12.34[1][b] (3rd Ed. 2008).

The inference that Digisound-WIE is at least a third-party beneficiary is further supported by the circumstances and the Joint Venture Contract itself and related documents. *Tradewinds*, 2004 WL 2533728, at *3 (surrounding circumstances at the time of execution are also taken into account). Those circumstances are that Digisound-WIE is merely the U.S. sales arm of its parent company, Digisound-Electronic GmbH, which is a signatory. As the sales arm, Digisound-WIE's role in carrying out the joint venture and making it successful is no different than had it been an unincorporated division of Digisound-Electronic GmbH. Its role was both the implicit and integral means for the joint venture, and thereby BeStar Electronics, to meet its aim of selling its products worldwide, including in the U.S.

The Joint Venture Contract was not only for the benefit of Digisound-WIE, in having the joint venture product to sell in the U.S., but also imposes obligations on it. That obligation is implicitly reflected by BeStar Electronics presently suing Digisound-WIE for payment for joint venture products.[1] *ESI, Inc. v. Coastal Corp.*, 61 F. Supp. 2d 35, 73-74 (S.D.N.Y.1999)

---

[1]While the Complaint does not refer to the joint venture, it also does not claim that the goods were made by BeStar Electronic rather than the joint venture. (See Complaint, ¶ 5.) Digisound-WIE's Answer and Counterclaim denies that the goods were purchased from BeStar Electronic, while ¶ 21 of the Counterclaim is fairly read as alleging that the BeStar Electronic invoices are for goods produced by the joint venture and covered by the Joint Venture Contract.

(signatory to joint venture agreement could sue non-signatory defendant for breach of contract where it had obligations related to joint venture).

Although not attached to the Counterclaim, the Joint Venture Contract is attached as Exhibit C to the Amended Complaint in the related case of *Digisound-WIE, Inc. v. BeStar Technologies, Inc.*, 07 C 6535 and is attached to this Response as Exhibit A.[2] Page five of the Joint Venture Contract lists Digisound-Electronic GmbH's responsibilities as including sales "outside China" and "providing orders from the international market for the joint venture company," and being "responsible for all marketing activities in the international market place." Article 20 contemplated that 90% of the joint venture's products would be sold outside of China. Article 24 also granted the "BeStar" trademark to the joint venture products to be sold through Digisound-Electronic GmbH and its affiliates.

The Joint Venture Contract expressly incorporates the joint venture's "feasibility study/Business Plan," which appear in Attachment 1 to Exhibit B[3] of this Response. Those documents were actually entitled "Feasibility Report" and "Strategic Plan." (See Exhibit B.) The Feasibility Report states that as part of the joint venture's strategic plan, the parties to the Joint Venture Contract decided to open a U.S. sales office, partly financed by BeStar Electronics, to concentrate on the U.S. automotive industry, which was calculated to show strong growth rates. The spreadsheet attached to the Report projected that by 2006 the joint venture's annual sales to the U.S. through Digisound-WIE would exceed $6 million, with a net annual profit to the joint venture of 10% or $600,000.

---

[2] On a motion to dismiss, the court may consider documents alleged or referenced in the complaint. *188 LLC v. Trinity Indus., Inc.*, 300 F.3d 730, 735 (7th Cir. 2002); 2 MOORE'S FED. PRAC. § 12.34[2]] (3rd Ed. 2008).

[3] Digisound-WIE will file the signed original of Exhibit B, the Affidavit of Michael Zeich in Response to Motion to Dismiss Counterclaim.

Accordingly, the parties to the Joint Venture Contract both expressly and implicitly intended for Digisound-WIE to have both the right and obligation to sell the joint venture's products and otherwise further the joint venture to BeStar Electronics' benefit. It is therefore at least a third-party beneficiary and entitled to enforce the Joint Venture Contract. *Rose v. Volvo Const. Equipment North America, Inc.*, 2007 WL 846123, *6, fn. 7 (N.D. Ohio, March 20, 2007) (Restated JV Agreement showed signatories intended defendants to have specific rights and obligations, and therefore defendants are intended third-party beneficiaries who may enforce the Restated JV Agreement's broad arbitration provision).

If the court determines, however, that the Counterclaim fails to adequately allege Digisound-WIE's status under the Joint Venture Contract, Digisound-WIE requests leave to file an Amended Counterclaim to further allege supporting facts. Although facts outside the Counterclaim and the documents it references cannot be considered in deciding a motion to dismiss for failure to state a claim, the following is offered to show that an amendment would not be futile.[4]

As stated in Exhibit B, the Affidavit of Michael Zeich, Digisound-Electronics, GmbH formed Digisound-WIE as the joint venture's U.S. sales arm. The joint venture's plan included penetrating the U.S. automotive market to develop substantial sales of the joint venture's products, which would be of economic benefit for BeStar Electronics. As discussed in the joint venture planning, BeStar Electronic was to transfer all of its assets to the joint venture and pay one-third of the cost of running a U.S. office, in return for which BeStar Electronics would

---

[4]Under Fed.R.Civ.P. 15(a), an order dismissing portions or all of the Counterclaim would not be a final judgment and therefore Digisound-WIE would have the right to amend the Counterclaim once. *Camp v. Gregory*, 67 F.3d 1286, 1289 (7th Cir. 1995) (an order dismissing the original complaint normally does not eliminate the plaintiff's right to amend once as a matter of right); *see also Crestview Vill. Apts. v. United States HUD*, 383 F.3d 552, 557-58 (7th Cir. 2004).

receive one-third of the profits generated by Digisound-WIE. This is reflected in the February 10, 2001, minutes of a BeStar Electronics Board of Directors (including Wu YiFie, the Managing Director of BeStar Electronic and the joint venture) meeting with Florian Greiling, who was then Digisound-Electronic GmbH's Managing Director. (Exhibit B, Attachment 2.) The minutes state that BeStar Electronic would cease operating and contribute all of its assets to the joint venture (*id.* at 1) and agreed to open a U.S. office to sell the joint venture parts, with BeStar Electronics to "bear 1/3 of the total cost" of the U.S. office in return for "1/3 of [its] profit," while receiving "weekly activity reports from Mr. Dirk De Young, manager of the US office," (*Id.* at 2-3 "Topic 5.")

A month later, Wu YiFie of BeStar Electronics emailed Digisound-Electronic GmbH that he was ready for the challenge of a U.S. branch and reaffirming that the "new joint venture" would cover "1/3 of [its] cost." (Exhibit B, Attachment 3). BeStar Electronics actually contributed slightly over $13,000. (Exhibit B, ¶ 7.) Thereafter, Digisound-WIE purchased product from the joint venture, with BeStar Acoustic using the BeStar Electronics name in performing the joint venture. (*Id.*, ¶ 10.)

Although sales were less than projected, Digisound-WIE purchased 8-10 million joint venture parts, for which it paid almost $2.5 million. (*Id.*, ¶ 9.) In fact, the "Goods" for which BeStar Electronics is suing were actually made and sold to Digisound-WIE by BeStar Acoustic. (*Id.*, ¶ 10.) Evidencing that these purchases were not pursuant to a vendor/vendee relationship, but pursuant to the Joint Venture Contract, BeStar Electronics has purported to terminate the Joint Venture Contract due to Digisound-WIE's alleged failure to pay BeStar Acoustic. (*Id.*, ¶ 11.)

---

However, the right to amend as a matter of course is not absolute and can be denied if futile.

The additional facts, as well as others, would thus show that BeStar Electronics was aware when it signed the Joint Venture Contract that Digisound-WIE would be the joint venture's U.S. office and that Digisound-WIE's sales of the joint venture's goods were integral to the success of Digisound-WIE, the joint venture, and BeStar Electronic. Thus, the "intention of the parties [as] gleaned from a consideration of all of the contract and the circumstances surrounding the parties at the time of its execution" thus suggests that Digisound-WIE is at least a third-party beneficiary of the Joint Venture Contract as to purchasing and reselling joint venture products. *Factory Mut. Ins. Co. v. CICA-TEC Terminal Equip. Corp.*, 05 C 4430, 2006 WL 3825028, *2 (N.D. Ill. Dec. 20, 2006) (applying Illinois law); *see also* (applying Illinois law).

DIGISOUND-WIE, INC.

By: s/ Arthur Sternberg
One of Its Attorneys

Arthur Sternberg
Susan Lorenc
Thompson Coburn LLP
dba Thompson Coburn Fagel Haber
55 E. Monroe, 40th Floor
Chicago, IL 60603
(312) 580-2235

C
**Tradewinds Aviation**, Inc. v. **Jet Support** Services, Inc.
N.D.Ill.,2004.
Only the Westlaw citation is currently available.
United States District Court,N.D. Illinois, Eastern Division.
**TRADEWINDS AVIATION**, INC. and Corporate Eagle Capital, L.L.C., Plaintiffs,
v.
**JET SUPPORT** SERVICES, INC., Defendant.
**No. 04 C 1406.**

Sept. 28, 2004.

Monte Loren Mann, Joseph J Siprut, Novack & Macey, Chicago, IL, for Defendant.
Michael J. Merlo, Donald G. MacHalinski, Karl W Roth, Merlo Kanofsky Brinkmeier & Gregg Ltd., Chicago, IL, Scott Raymond Torpey, Jaffe, Raitt, Heuer & Weiss, Detroit, MI, for Plaintiffs.

*MEMORANDUM OPINION AND ORDER*

GUZMAN, J.
***1** In this diversity action, plaintiffs **Tradewinds Aviation**, Inc. ("**Tradewinds**") and Corporate Eagle Capital, L.L.C. ("Corporate Eagle") seek compensatory and consequential damages, costs, and attorneys' fees for breach of contract against defendant **Jet Support** Services, Inc. ("JSSI"). In Count II of the Amended Complaint, Corporate Eagle alleges breach of contract as a third-party beneficiary. JSSI, in separate motions, moves to (1) dismiss Count II for failure to state a claim upon which relief may be granted pursuant to Federal Rule of Civil Procedure ("Rule") 12(b)(6); and (2) strike Plaintiffs' jury demand and prayer for consequential damages. For the reasons set forth below, the Court denies the motion to dismiss and grants the motion to strike.

*FACTS*

The following facts from the Amended Complaint are presumed to be true for the purposes of this motion to dismiss. *See Conley v. Gibson,* 355 U.S. 41, 45-46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957).**Tradewinds**, which operates a corporate aircraft management service, and Corporate Eagle, which owns corporate aircraft, are participants in a joint venture. (Am.Compl.¶¶ 1-2, 6.) Pursuant to the joint venture, Corporate Eagle owns certain aircrafts in **Tradewinds**' fleet, Corporate Eagle leases the aircrafts to third parties, and **Tradewinds** provides management services for the aircrafts. (*Id.* ¶ 6.) One of the Corporate Eagle aircrafts that **Tradewinds** manages is a Hawker aircraft with the serial number NA-0291 and registration number N947CE ("Hawker Aircraft").(*Id.*)

**Tradewinds** and JSSI entered into a contract whereby JSSI would provide, among other things, programs for the repair and maintenance of the turbine engines identified in the Application section of the contract. (*Id.* ¶ 7; Am. Compl. Ex. A, JSSI Complete Engine Maintenance Program Contract ["Contract"] at 8.) [FN1] The Application lists the Hawker Aircraft and explicitly notes that Corporate Eagle is the owner of the aircraft. (Am. Compl. Ex. A, Contract at 21.)

FN1. Pursuant to Rule 10(c), "[a] copy of any written instrument which is an exhibit to a pleading is a part thereof for all purposes ."

After Tradewinds and JSSI entered into the contract, the Hawker Aircraft twice sustained engine damage. (Am.Compl.¶¶ 9, 11.) On both occasions the Hawker Aircraft was taken to a JSSI-authorized repair facility, and the faulty engine was replaced with a loaner engine. (*Id.* ¶¶ 10, 12.)The damaged engine was submitted to JSSI for replacement or repair, and the repair and rental costs were submitted to JSSI for reimbursement. (*Id.* ¶ 13.)JSSI has not repaired or replaced the engine or reimbursed plaintiffs for the aforementioned charges. (*Id.* ¶

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

14.)JSSI denies liability under the contract, contending that the engines were damaged from pilots hot starting the engines, damage that is not covered under the contract. (*Id.*) Plaintiffs deny hot starting the engines and allege that JSSI has failed to satisfy its obligations under the contract. (*Id.* ¶ 16.)

Corporate Eagle alleges that it was an intended third-party beneficiary of the contract and that JSSI therefore breached contractual obligations owed to Corporate Eagle. (*Id.* ¶ 27.)Corporate Eagle further alleges that JSSI was aware that Tradewinds managed Corporate Eagle aircrafts and that JSSI entered into the contract contemplating that it would benefit Corporate Eagle if a Corporate Eagle aircraft engine required maintenance. (*Id.* ¶¶ 7, 24.)

***2** Among other things, Plaintiffs pray for damages for all natural, proximate and probable or direct consequential damages. (*Id.* ¶ B.) In addition, Plaintiffs demand a jury trial. Defendant now moves to dismiss Count II and to strike Plaintiffs' jury demand and their request for consequential damages.

*DISCUSSION*

I. *Motion to Dismiss*

A motion to dismiss under Rule 12(b)(6) challenges whether the complaint sets forth a claim upon which relief may be granted. *Gen. Elec. Capital Corp. v. Lease Resolution Corp.,* 128 F.3d 1074, 1080 (7th Cir.1997). In deciding a motion to dismiss, the Court must assume all well-pleaded facts as true and draw all reasonable inferences from such facts in favor of the claimant.[FN2]*Conley,* 355 U.S. at 45-46. Furthermore, under the federal notice pleading standard, a short and plain statement of the claim and the grounds for such claim is sufficient to survive a motion to dismiss; detailed facts are not required. *Id.* at 47.

> FN2. For this reason, the Court denies Plaintiffs' Motion for Leave to Supplement Response Brief to Motion to Dismiss. The motion seeks to supplement its response with alleged testimonial admissions made by JSSI's representatives, and factual proof of Plaintiffs' allegations is not necessary to decide the motion.

JSSI's motion to dismiss argues that Corporate Eagle is not a third-party beneficiary of the contract and thus lacks standing to sue for breach of contract. "Whether a plaintiff is a third-party beneficiary of a contract is a legal conclusion that [the Court] need not accept for the purpose of a motion to dismiss."*Choi v. Chase Manhattan Mortgage Co.,* 63 F.Supp.2d 874, 881 (N.D.Ill.1999); *see Christakos v. Intercounty Title Co.,* No. 99 C 8334, 2001 WL 138896, at *4 (N.D.Ill. Feb.16, 2001).

The parties agree that Illinois law governs the interpretation of the contract. (Am. Compl. Ex. A, Contract at 13.) Under Illinois law, there is a strong presumption against third-party beneficiaries because it is assumed that parties to a contract intend the contract to apply only to them. *Quinn v. McGraw-Hill Cos., Inc.,* 168 F.3d 331, 334 (7th Cir.1999). However, a third-party beneficiary does have standing to sue on a contract, although not a party to the contract, if the contracting parties intended the third party to benefit from the contract. *Am. United Logistics, Inc. v. Catellus Dev. Corp.,* 319 F.3d 921, 930 (7th Cir.2003) (explaining that a third party who receives an unintended benefit from the contract is an incidental third party and does not have standing). The intent of the contracting parties is "based on the contract as a whole as well as the understandings between the parties at the time of the contract's execution."*Id.* The surrounding circumstances at the time of execution are also taken into account. *F.W. Hempel & Co., Inc. v. Metal World, Inc.,* 721 F.2d 610, 613 (7th Cir.1983); *McCoy v. Ill. Int'l Port Dist.,* 334 Ill.App.3d 462, 268 Ill.Dec. 439, 778 N.E.2d 705, 712 (Ill.App.Ct.2002). The best evidence of the parties' intent is express language in the contract identifying the third-party beneficiary, but an implied

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

showing may be sufficient if " 'the implication that the contract applies to third parties [is] so strong as to be practically an express declaration." ' *Quinn,* 168 F.3d at 334 (quoting *155 Harbor Drive Condo. Ass'n v. Harbor Point, Inc.,* 209 Ill.App.3d 631, 154 Ill.Dec. 365, 568 N.E.2d 365, 375 (Ill.App.Ct.1991)).

***3** JSSI argues that Corporate Eagle is not a third-party beneficiary because the contract expressly excludes third-party beneficiaries. (Def.'s Mot. Dismiss at 3.) The provision states, in part, that the rights and obligations of the parties are for the exclusive benefit of such parties and shall not benefit any unrelated third parties. (Am. Compl. Ex. A, Contract at 13.) Corporate Eagle argues that it is not an unrelated party because of its joint venture with Tradewinds. (Pl.'s Resp. Mot. Dismiss at 6.) After reviewing the Amended Complaint (including the attached contract) and making all reasonable inferences in favor of the plaintiff, the Court finds that Corporate Eagle has set forth a claim upon which relief may be granted. Corporate Eagle alleges that JSSI was aware that **Tradewinds** managed Corporate Eagle aircrafts. (Am.Compl.¶ 24.) In addition, Corporate Eagle alleges that JSSI and **Tradewinds** "clearly contemplated" that the contract would benefit Corporate Eagle if one of its aircraft had engine problems. (*Id.* ¶ 7, 154 Ill.Dec. 365, 568 N.E.2d 365.) The contract also expressly provides for the coverage of engines listed in the Application. (*Id.* Ex. A, Contract at 8.) The Hawker Aircraft is included in the Application, and Corporate Eagle is listed as its owner.(*Id.* at 19-21, 154 Ill.Dec. 365, 568 N.E.2d 365.) As a result, Corporate Eagle is expressly included in the contract, and the alleged circumstances surrounding the contract's execution may show that Corporate Eagle was an intended third-party beneficiary. *See Paukovitz v. Imperial Homes, Inc.,* 271 Ill.App.3d 1037, 208 Ill.Dec. 417, 649 N.E.2d 473, 475-76 (Ill.App.Ct.1995) (reversing the dismissal of the plaintiff's third-party beneficiary breach of contract claim because the plaintiff's name appeared on the contract, and the parties to the contract negotiated with the knowledge the plaintiff would benefit from the contract).

Accordingly, it is reasonable to infer that Tradewinds and JSSI intended the contract to benefit Corporate Eagle and did not intend for the provision against third-party beneficiaries to apply to Corporate Eagle. *See Am. United Logistics,* 319 F.3d at 930-31 (holding that the plaintiff stated a claim as a third-party beneficiary despite express contractual language that " 'nothing herein is intended to create any third party benefit," ' when a separate contractual provision expressly conferred an intended benefit on the plaintiff and the circumstances surrounding the contract's execution supported the intention). Despite the strong presumption against third-party beneficiaries under Illinois law, the Court finds that the allegations in the Amended Complaint, taken as true and with all reasonable inferences drawn in favor of Corporate Eagle, are sufficient to set forth a third-party beneficiary breach of contract claim. Therefore, JSSI's motion to dismiss Count II is denied.

II. *Motion to Strike Jury Demand*

JSSI argues Plaintiffs' jury demand should be stricken because the contract at issue contains an express "Waiver of Jury Trial" provision. Although the Seventh Amendment to the United States Constitution guarantees the right to a jury trial in civil cases, the right may be waived if contracting parties knowingly and voluntarily agree to a waiver. *In re Reggie Packing Co., Inc.,* 671 F.Supp. 571, 573 (N.D.Ill.1987). Because of the fundamental nature of a jury trial, every reasonable presumption is indulged against waiver.*Whirlpool Fin. Corp. v. Sevaux,* 866 F.Supp. 1102, 1105 (N.D.Ill.1994). Courts consider four factors in determining whether a party knowingly and voluntarily entered into a waiver: "(1) the parties' negotiations concerning the waiver provision, if any; (2) the conspicuousness of the provision; (3) the relative bargaining power of the parties; and (4) whether the waiving party's counsel had an opportunity to review the agree-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

ment."[FN3] *Id.*

FN3."The circuits are split on whether the party asserting the validity of such a waiver bears the burden of proof as to whether the waiver was knowingly and voluntarily executed."*Pierce v. Atchison Topeka & Santa Fe Ry. Co.,* 110 F.3d 431, 435 (7th Cir.2002). However, the Court need not resolve the issue because no matter where the burden lies, it is clear that Plaintiffs waived their right to a jury trial. *See Household Commercial Fin. Servs., Inc. v. Suddarth,* No. 01 C 4355, 2002 WL 31017608, at *8 (N.D.Ill. Sept.9, 2002).

***4** With respect to the first factor, the absence of negotiations tends to militate against a finding of waiver. *Id.* at 1106.When a form contract is not susceptible to negotiation, there is a presumption that the parties did not knowingly and voluntarily agree to the waiver. *See Heller Fin., Inc. v. Finch-Bayless Equip. Co., Inc.,* No. 90 C 1672, 1990 WL 77500, at *2 (N.D.Ill. May 31, 1990). Plaintiffs argue that the contract was a form contract, routinely used by JSSI, "without *substantial* negotiations for *all* provisions in the contract."(Pl.'s Resp. Mot. Strike at 6-7 (emphasis added).) In addition, **Tradewinds** attaches an affidavit from its president stating that **Tradewinds** entered into the contract without negotiations. (Pl.'s Resp. Mot. Strike Ex. B, Nini Aff. ¶ 4.) Although Plaintiffs do not allege that the contract could not be negotiated, only that there were no substantial negotiations, JSSI offers no argument that the terms were in fact susceptible to negotiation. Therefore, this factor therefore weighs in favor of Plaintiffs and against a finding of waiver.

The second factor to be considered is the conspicuousness of the waiver provision. A waiver provision is conspicuous when it stands out from the majority of the document. *See Household Commercial Fin. Svcs. Inc. v. Suddarth,* No. 01 C 4355, 2002 WL 31017608, at *8 (N.D.Ill. Sept.9, 2002) (finding a provision conspicuous when the font was in all capital letters and in boldface type); *see also Mellon Bank, N.A. v. Miglin,* No. 92 C 4059, 1993 WL 281111, at *12 (N.D.Ill. Apr.29, 1993) (finding the waiver provision sufficiently conspicuous when the typeface was the same as all other provisions within the seven page contract and distinguishing a case in which the provision was hidden in a twenty-two page document); *In re Reggie,* 671 F.Supp. at 574 (holding that a waiver clause was conspicuous where it was found "at the end of a paragraph, just two inches above the parties' signatures").

The waiver provision in the contract, entitled "Waiver of Jury Trial," reads: "EACH OF THE PARTIES HEREBY KNOWINGLY, VOLUNTARILY AND INTENTIONALLY WAIVES ANY RIGHTS IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION BASED HEREON...." (Am. Compl. Ex. A, Contract at 14.) The waiver provision is one of only two provisions in all capital letters within the fifteen-page contract, and it plainly stands out from the majority of the document. Because the provision is sufficiently conspicuous, this factor weighs in favor of waiver.

Third, the Court must analyze the relative bargaining power of the parties. Typically, sophisticated and experienced parties to a contract do not present bargaining power issues serious enough to invalidate a waiver provision. *See Mellon Bank,* 1993 WL 281111, at *12 (distinguishing its facts, involving sophisticated and experienced businessmen, from cases where a party desperately needed funds or had no opportunity to negotiate); *see also Bonfield v. AAMCO Transmissions, Inc.,* 717 F.Supp. 589, 596 (N.D.Ill.1989) (holding that the jury waiver was enforceable, despite the defendant's unwillingness to accept changes to a contract, because the plaintiff could freely reject the deal). Tradewinds deals with multimillion-dollar aircrafts in the ordinary course of business and is a sophisticated and experienced party. In addition, Plaintiffs do not argue that they had no choice but to enter into the contract. This factor therefore weighs in JSSI's favor.

***5** The last factor addresses whether the party's

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

counsel had an opportunity to review the contract. Plaintiffs contend that they did not employ or retain an attorney to review the contract, but they do not argue that they could not have done so. (Pl.'s Resp. Mot. Dismiss at 7.) Courts have enforced jury waivers when, as in this case, the parties have an opportunity to review the contract but choose not to do so. *See Bonfield,* 717 F.Supp. at 596;*Sutter Ins. Co. v. Applied Sys., Inc.,* No. 02 C 5849, 2004 WL 161508, at *7 (N.D.Ill. Jan.26, 2004); *Household,* 2002 WL 31017608, at *8. Accordingly, this factor also weighs in favor of JSSI.

Plaintiffs' final argument is that the Tradewinds representative who signed the contract did not realize that he was "signing away Plaintiffs' right to a jury trial."(Pl.'s Resp. Mot. Dismiss at 6.) However, "the failure to read an agreement provides defendants no relief from the application of a jury waiver provision."*Household,* 2002 WL 31017608, at *8. Three of the four relevant factors clearly militate in favor of finding that Plaintiffs waived their right to a jury trial, and JSSI's motion to strike the jury demand is therefore granted.

III. *Motion to Strike Request for Consequential Damages*

Paragraph B in the Amended Complaint's prayer for relief requests a "further award for any and all natural, proximate and probable or direct consequential damages."(Am.Compl.¶ B.) JSSI argues that this request for damages should be stricken because the contract states: "JSSI shall in no event be liable to the Customer for any loss of revenue, loss of profits or any similar business loss arising from the failure of JSSI to perform its obligations hereunder," and "[i]n no event shall JSSI be liable for consequential or incidental damages incurred by Customer."(Am. Compl. Ex. A, Contract at 8.) "Waivers of consequential damages are not prohibited unless 'unconscionable,' and the same principle has, sensibly in our view, been assumed applicable to waivers of incidental damages."*Cole Energy Dev. Co. v. Ingersoll-Rand Co.,* 8 F.3d 607, 611 (7th Cir.1993) (quoting 810 ILL. COMP. STAT.. § 5/2-719(3)). Plaintiffs do not contend that the contract's waiver of consequential or incidental damages provision is unconscionable, and they do not otherwise argue that Paragraph B should not be stricken. Instead, Plaintiffs opine that Paragraphs 21(d)-(f), which were not even addressed in JSSI's motion, should not be stricken. The Court finds that the contract expressly waives the right to recover consequential and incidental damages, and Plaintiffs have failed to offer any proof or argument that this provision should not be enforced. Therefore, JSSI's motion to strike is granted, and Paragraph B of the prayer for relief is stricken to the extent that it seeks an award for consequential or incidental damages.

*CONCLUSION*

For the reasons set forth above, JSSI's motion to dismiss [doc. no. 22-1] is denied, and JSSI's motion to strike [doc. no. 23-1] is granted. Plaintiffs' Motion for Leave to Supplement Response Brief to Motion to Dismiss [doc. no. 34-1] is denied.

***6** SO ORDERED

N.D.Ill.,2004.
Tradewinds Aviation, Inc. v. Jet Support Services, Inc.
Not Reported in F.Supp.2d, 2004 WL 2533728 (N.D.Ill.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**C**
**Factory** Mut. Ins. Co. v. **CICA-TEC Terminal** Equipment Corp.
N.D.Ill.,2006.
Only the Westlaw citation is currently available.

United States District Court,N.D. Illinois, Eastern Division.
**FACTORY** MUTUAL INSURANCE COMPANY, as subrogee of the City of Chicago, Plaintiff,
v.
**CICA-TEC TERMINAL** EQUIPMENT CORPORATION, an Illinois corporation, and TCTJB V, Inc., d/b/a Affiliated Building Services, Inc., a foreign corporation, Defendants.
**No. 05 C 4430.**

Dec. 20, 2006.

Mark Nicholas Senak, Steven Hesser Leech, Salvi, Schostok, Pritchard, Chicago, IL, Matthew Lawrence Williams, Salvi Schostok & Pritchard, Waukegan, IL, for Plaintiff.
Howard Krauskopf, Scott Bryan Dolezal, Myers, Miller & Krauskopf, Chicago, IL, for Defendants.

*MEMORANDUM OPINION AND ORDER*

NOLAN, Magistrate J.
***1** Plaintiff **Factory** Mutual Insurance Company ("FMIC"), as subrogee of the City of Chicago, filed suit against Defendants CICA **Terminal** Equipment Corporation ("**CICA TEC**") and TCTJB V, Inc., d/b/a Affiliated Building Services, Inc. ("ABS"), seeking to recover for losses sustained in a fire at the International **Terminal** of Chicago's O'Hare Airport. The parties have consented to the jurisdiction of the United States Magistrate Judge pursuant to 28 U.S.C. § 636(c). ABS now moves to dismiss two of the three claims asserted against it for failure to state a claim. For the reasons set forth here, the motion is denied.

*BACKGROUND*

FMIC, a Rhode Island corporation with its principal place of business in Johnston, Rhode Island, provides commercial and industrial property insurance and a variety of risk management services. (Cmplt. ¶ 2; http://www.hoovers.com/fm-global/-ID__106386-/free-co-factsheet.xhtml.) Defendant CICA TEC, an Illinois corporation with its principal place of business in Chicago, Illinois, operates and maintains airline equipment and systems.(*Id.* ¶ 3; Ex. A to Pl. Resp., at FM 282.) Defendant ABS is a Pennsylvania corporation with its principal place of business in Pittsburgh, Pennsylvania, and provides "professional and technical services regarding the operation and maintenance of ... equipment and services associated with the operations of an air passenger terminal facility."(*Id.* ¶ 4; Ex. B to Pl. Resp., at FM 0189.)

A. The Insurance Agreements

The City of Chicago, a municipal corporation, owns and operates O'Hare International Airport. (*Id.* ¶¶ 6, 7.) Sometime prior to August 2001, FMIC issued an insurance policy to the City covering, among other things, damage or loss caused by fire at O'Hare's international **Terminal**. (*Id.* ¶ 8.) On January 1, 1990, the City entered into a contract with **CICA TEC** to operate and maintain certain equipment at the airport, including the baggage handling system at the International **Terminal** (the "International baggage system").(*Id.* ¶ 14.)On October 1, 1996, **CICA TEC** entered into a Maintenance and Operations Service Agreement with ABS (the "Service Agreement"), providing that ABS would be responsible for the operation, inspection, and maintenance of the International baggage system. (*Id.* ¶ 15.)

B. The Insurance Claims

On August 3, 2001, a fire broke out in one of the baggage conveyor systems at the International Terminal, causing smoke, heat, and fire damage to the

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

conveyor system and to various other portions of the Terminal. (*Id.* ¶ 17.)The City sought indemnification and reimbursement from FMIC for the damage, and FMIC paid the City pursuant to the terms of its insurance policy. (*Id.* ¶¶ 10, 11.)In exchange, the City subrogated to FMIC any claims it may have against any individual or entity that may be responsible for causing the fire and the resulting damage. (*Id.* ¶ 12.)

C. The Lawsuit

***2** On August 2, 2005, FMIC filed this diversity suit alleging that **CICA TEC** and ABS are liable for the fire damage at O'Hare's International **Terminal**. FMIC charges both companies with negligence and breach of contract, and seeks indemnification for the expenses it incurred under the insurance policy. **CICA TEC** has answered the Complaint in full. ABS has answered the negligence and breach of contract counts (Count II and IV), but now seeks dismissal of not only the indemnification count (Count VI) but also the breach of contract count that was previously answered. FMIC makes no mention of this seeming inconsistency.

*DISCUSSION*

A. Standard of Review

The purpose of a motion to dismiss is to test the sufficiency of the plaintiff's complaint, not to decide its merits. *Gibson v. City of Chicago,* 910 F.2d 1510, 1520 (7th Cir.1990). A motion to dismiss will be granted only "if it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which entitles him to relief."*Conley v. Gibson,* 355 U.S. 41, 45-46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). In reviewing a motion to dismiss for failure to state a claim, the court accepts as true all factual allegations in the plaintiff's complaint and draws all reasonable inferences in its favor. *Franzoni v. Hartmarx Corp.,* 300 F.3d 767, 770 (7th Cir.2002).

B. Analysis

ABS argues that FMIC cannot state a claim for breach of contract or indemnification under Illinois law [FN1] because the City is neither in privity of contract with ABS nor a third-party beneficiary of the Service Agreement. It is undisputed that the City was not a signatory to the contract between CICA TEC and ABS. Thus, to state a claim for breach of, or indemnification under, that Service Agreement, FMIC must allege that the agreement was made for the City's direct benefit. As Illinois courts explain, "[a] third party may only sue for breach of contract ... if the contract was entered into for the party's direct benefit; if the third-party's benefit is merely incidental, he has no right of recovery on the contract."*Yakubinis v. Yamaha Motor Corp., U.S.A.,* 365 Ill.App.3d 128, 140, 301 Ill.Dec. 542, 847 N.E.2d 552, 563 (1st Dist.2006).*See also Federal Ins. Co. ex rel. Singer v. ADT Security Sys., Inc.,* 222 F.R.D. 578, 581 (N.D.Ill.2004) ("For a third party to have a right to sue, the contract must be undertaken for the plaintiff's direct benefit and the contract itself must affirmatively make this intention clear.") (internal quotations omitted). In determining whether a third party is a direct beneficiary of a contract, courts look to "the intention of the parties, which must be gleaned from a consideration of all of the contract and the circumstances surrounding the parties at the time of its execution."*Id.,* 301 Ill.Dec. 542, 847 N.E.2d at 563 (internal quotations omitted).

FN1. The parties agree that this case is governed by Illinois law.

ABS argues that the Service Agreement is not intended to benefit the City in any way; rather, "[t]he only beneficiary to the contract is **CICA TEC**."(Pl.Mot. ¶ 14.) In support of this assertion, ABS emphasizes that the Agreement expressly states that the City is not an intended party to the contract:

***3** Neither **CICA TEC** nor the Executive Director is a general contractor, and unless expressly

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

provided for in this Agreement, does not have the obligations of a general contractor. **CICA TEC** will execute all contracts with Contractor. Neither the Executive Director nor the City are, or are intended to be, parties to such contracts. **CICA TEC** will have no authority to bind the Executive Director or the City in any way with Contractor, its Subcontractors or any other third parties.

(Service Agreement, Ex. B to Pl. Resp., Section 3.02, at 5.) According to ABS, "[t]he only basis upon which the City would have grounds for maintaining its breach of contract claim ... would be if there was an express provision in the CICA TEC/ ABS contract that provided third-party beneficiary status to the City of Chicago. No such express provision exists in the Agreement."(Pl. Mot. ¶¶ 9, 12 (citing *Ball Corp. v. Bohlin Bldg. Corp.,* 187 Ill.App.3d 175, 177, 134 Ill.Dec. 823, 543 N.E.2d 106, 107 (1st Dist.1989)) ("A third party is a direct rather than an incidental beneficiary when the contracting parties have manifested in their contract an intention to confer a benefit upon the third party.")

FMIC disagrees, arguing that CICA TEC and ABS manifested an intent to benefit the City by specifically mentioning it in the Service Agreement. In support of this theory, FMIC directs the court to *People ex rel. Resnik v. Curtis & Davis, Architects & Planners, Inc.,* 78 Ill.2d 381, 36 Ill.Dec. 338, 400 N.E.2d 918 (1980), in which an architect entered into a contract with the Illinois Building Authority ("IBA") for services related to the construction of a correctional center in Vienna, Illinois. *Id.* at 382-83, 36 Ill.Dec. 338, 400 N.E.2d at 918. The State of Illinois filed suit against the architect alleging breach of contract, and a question arose as to whether the State was a proper party plaintiff. *Id.* at 383, 36 Ill.Dec. 338, 400 N.E.2d at 918. The Illinois Supreme Court held that the State could sue under the contract because the agreement "convincingly displays the intent of the parties to make the State a direct beneficiary."*Id.* at 385, 36 Ill.Dec. 338, 400 N.E.2d at 920. The court noted that the preamble to the contract explained that the State intended to construct a penitentiary; one section of the contract required the architect to "consult with" the State "to ascertain the requirements of [the] Project"; and another section provided that the architect "hereby indemnifies and holds harmless" the State. *Id.* at 386, 36 Ill.Dec. 338, 400 N.E.2d at 920. According to the court, "[c]onstruction of the prison would directly benefit the State, ... not the parties."Thus, the State could pursue its breach of contract claim. *Id.* at 386-87, 36 Ill.Dec. 338, 400 N.E.2d at 920.

FMIC notes that, like the contract in *Resnik,* the Service Agreement contains numerous sections that affirmatively mention the City. For example, ABS is expressly required to indemnify the City:

Contractor [ABS] covenants and agrees to defend, indemnify, keep, save and hold harmless fully CICA TEC, its Executive Director, AMSI, the ITAPs, the City, and each of their respective officials, agents and employees, against any and all claims, causes of action, suits, judgments, losses, obligations, costs and expenses, including legal fees and expenses arising out of or in connection with Contractor's use of the CICA TEC Equipment or the performance of Services and not arising from the negligent act or omission of CICA TEC, its Executive Director, AMSI, the ITAPs, City, and each of their respective agents, officials, and employees.

***4** (Service Agreement, Ex. B to Pl. Resp., Section 4.01, at 14.) The indemnification further requires that the City, its officials, employees, and agents "be named as additional insureds" on ABS insurance policies. (*Id.* Section 4.02, at 15.) Another section of the Service Agreement requires that ABS's "books and accounts in connection with the Services will be open to inspection by the Executive Director or other authorized representative of CICA TEC and City upon reasonable notice given by CICA TEC to Contractor."(*Id.* Section 3.09, at 13.)

In addition to these provisions, the Service Agreement includes several definitions relating to various City departments and personnel. For example,

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

"DOA" is defined as the City's Department of Aviation; "Commissioner of Aviation" is defined as "the chief executive of the Department of Aviation for the City ..."; "Comptroller" is defined as "the chief executive of the Department of Finance for the City ..."; and "Purchasing Agent" is defined as "the chief executive of the Department of Purchases, Contracts and Supplies for the City ..."(*Id.* at 2-4, 36 Ill.Dec. 338, 400 N.E.2d 918.) The opening Recitals of the Service Agreement also mention the City:

WHEREAS, the City of Chicago ("City"), will plan, design, procure, construct, start up and relocate certain operations into a new permanent International Facility at Chicago O'Hare International Airport, ("Project"); and

WHEREAS, City and CICA TEC have entered into a certain agreement dated as of January 1, 1990 ..., as may be amended or supplemented from time to time, pursuant to which CICA TEC will manage, coordinate and administer the CICA TEC Equipment as defined hereinafter, to be incorporated in the Project ...

(*Id.* at 1, 36 Ill.Dec. 338, 400 N.E.2d 918.) As in *Resnik,* FMIC argues, it is clear that the services performed under the Service Agreement would directly benefit the City, which owns and operates O'Hare's International Terminal.

The court agrees that FMIC has stated breach of contract and indemnification claims against ABS sufficient to withstand a motion to dismiss. Contrary to ABS's suggestion, the mere fact that the Service Agreement states that the City is not intended as a party to the contract does not preclude a finding that the City is nonetheless a direct beneficiary of that agreement. *See Tradewinds Aviation, Inc. v. Jet Support Servs., Inc.,* No. 04 C 1406, 2004 WL 2533728, at *2 (N.D.Ill. Sept.28, 2004) ("[A] third-party beneficiary does have standing to sue on a contract, although not a party to the contract, if the contracting parties intended the third party to benefit from the contract.") Nor is it necessary for the parties to have affirmatively stated that the City was an intended beneficiary. The City is expressly named in the Service Agreement, and the circumstances surrounding the agreement's execution may show that the City-which owns and operates O'Hare Airport-was an intended third-party beneficiary. (Cmplt.¶¶ 7, 33.) *See Paukovitz v. Imperial Homes, Inc.,* 271 Ill.App.3d 1037, 1039, 208 Ill.Dec. 417, 649 N.E.2d 473, 475-76 (3d Dist.1995) (reversing dismissal of plaintiff's third-party breach of contract claim where the plaintiff's name appeared on the contract and the parties to the contract negotiated with knowledge that the plaintiff would benefit from the agreement).

*CONCLUSION*

***5** For the reasons stated above, ABS's Motion to Dismiss Counts IV and VI of FMIC's Complaint [Doc. 10] is denied.

N.D.Ill.,2006.
Factory Mut. Ins. Co. v. CICA-TEC Terminal Equipment Corp.
Slip Copy, 2006 WL 3825028 (N.D.Ill.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.